**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

DAVID M. BARRETT,

        **Plaintiff,**

v.                              **Civil Action No. 5:10CV10**
                                 **(The Honorable Frederick P. Stamp)**

MICHAEL J. ASTRUE,
**Commissioner of Social Security,**

        **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

This is an action for judicial review of the final decision of the Defendant, Commissioner of the Social Security Administration ("Defendant," and sometimes "the Commissioner"), denying Plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act. The matter is awaiting decision on Plaintiff's Motion for Summary Judgment and Motion for Remand Pursuant to the Sixth Sentence of 42 U.S.C. § 405(g) and Defendant's Motion for Summary Judgment, which have been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Gen. P. 86.02.

## I. PROCEDURAL HISTORY

David M. Barrett ("Plaintiff") filed an application for DIB on September 20, 2007, alleging disability due to broken right leg and herniated disks since September 30, 2006, his date last insured (R. 9, 89, 121). Plaintiff's applications were denied at the initial and reconsideration levels (R.55, 56). Plaintiff requested a hearing, which Administrative Law Judge George A. Mills ("ALJ") held on May 7, 2009 (R. 20). Plaintiff, represented by Jennifer LaRosa, a non-attorney representative, testified on his own behalf (R. 20-49). Also testifying was Vocational Expert Larry Bell ("VE")

(R. 49-53 ).  On June 24, 2009, the ALJ entered a decision finding Plaintiff could perform a range of sedentary work (R. 9-19).  Plaintiff timely filed a request for review to the Appeals Council (R. 4).  On December 7, 2009,  the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 1-3).

## II. FACTS

Plaintiff was born on July 21, 1964, and was 42 years old at the time he was last insured (R. 89).  He has a tenth-grade education and past relevant work as a truck driver, carpenter, and handyman (R.  125, 104, 30).

On September 18, 2001, Plaintiff underwent a polysomnogram study, without continuous positive airway pressure machine ("CPAP"), at United Hospital Center.  Dr.  Husari diagnosed obstructive sleep apnea and upper airway resistance syndrome.  He recommended Plaintiff use a nasal CPAP machine.  He found Plaintiff had recurrent obstructive apneas and hypopneas and "more than 1700 episodes of loud snoring," which disrupted Plaintiff's sleep and caused frequent arousals/awakenings" (R. 312).  Plaintiff' sleep efficiency was 82.1%; his total sleep time was 6.4 hours (R.  313).

On August 19, 2003, Plaintiff underwent a polysomnogram study, without use of a CPAP machine, at the United Hospital Center Sleep Lab.  Dr.  Zuriqat diagnosed excessive daytime sleepiness, snoring and upper airway resistance syndrome.  Plaintiff's "total sleep time was 7.4 hours with a sleep efficiency of 91%"; Plaintiff had eight obstructive apneas, twenty-eight hypopneas, and 1,351 episodes of loud snoring, which did disrupt his sleep; his lowest oxygen saturation was 87%. (R.  307).  Plaintiff's limb movements with arousals were twenty-two, with an index of 2.96 per hours of sleep.  Plaintiff's total arousals were 176, or 23.7 per hours of sleep (R.  310).  Plaintiff was

advised about diet and weight management (R. 307).

On November 13, 2003, Plaintiff underwent an open reduction internal fixation of the fibula and external fixation of the distal tibia after having fallen fourteen feet. On November 26, 2003, Plaintiff underwent a procedure for the removal of his external fixator and definitive open reduction internal fixation of his right distal tibia. He was released to home on November 28, 2003, instructed by Dr. Gehrmann to "maintain toe touch weightbearing (sic) status on the right lower extremity," and was prescribed OxyContin, Percocet, and Senokot (R. 188).

On February 23, 2004, Dr. Gehrmann noted Plaintiff was "showing delayed signs of healing," post surgery, and recommended the use of an Exogen bone stimulator. He instructed Plaintiff to start weight bearing at fifty pounds and increase the weight by ten-to-fifteen pounds per week. Dr. Gehrmann instructed Plaintiff to continue wearing the "boot" while weight bearing (R. 192).

On March 4, 2004, Dr. Gehrmann found Plaintiff was "doing fairly well." He noted Plaintiff had a mass in the "lateral aspect of his leg" and ordered an ultrasound to determine if it was fluid filled or solid (R. 194).

Also on March 4, 2004, Plaintiff had an x-ray made of his right ankle. It showed "internal fixation of healing pilon fracture of distal tibia" and "internal fixation of fracture of the distal fibula with likely lack of bony bridging" (R. 195-96).

On March 24, 2004, Dr. Gehrmann noted Plaintiff's ankle no longer hurt and he had "been progressing his weightbearing (sic)" slowly. Plaintiff had good range of motion upon examination; he was grossly neurologically intact; his pedal pulses were good. Dr. Gehrmann opined Plaintiff was "turning the corner and actually improving." He continued to use the bone stimulator. Dr.

Gehrmann prescribed Vicoden, ibuprofen, and physical therapy (R. 198).

From March through May, 2004, Plaintiff participated in physical therapy (R. 172-84).

Dr. Gehrmann opined, on May 27, 2004, that Plaintiff had "some posttraumatic degenerative-type symptoms, as well as possibly scar tissue in his ankle joint." He found Plaintiff's "fractures [were] essentially healed." Dr. Gehrmann treated Plaintiff's ankle with a cortisone injection. He prescribed Ultracet (R. 200).

On October 15, 2004, Plaintiff completed a polysomnogram, with no CPAP machine. Dr. Zuriqat diagnosed excessive daytime sleepiness and narcolepsy. He noted the following: Plaintiff's total sleep time was 7.1 hours, "resulting in a sleep efficiency of 91%"; Plaintiff had zero apneas and fifteen hypopneas, "resulting in a respiratory disturbance index (RDI) of 2.1 events per hour of sleep"; his oxygen saturation was within normal range; he had "mild periodic limb movement disorder with an index of 10.3 events per hours of sleep," most of which did not disturb Plaintiff's sleep. (R. 298-99). Plaintiff's total arousals were 131, or 18.5 per hour (R. 302).

Also on October 15, 2004, Dr. Zuriqat performed Multiple Sleep Latency Testing. The results showed Plaintiff had five naps with "mean sleep latency . . . [of] 6.7 minutes with 2 sleep onset REM periods" (R. 304). Dr. Zuriqat diagnosed narcolepsy, prescribed Provigil, noted Plaintiff would "be observed for any symptoms of cataplexy," and instructed Plaintiff to return in one month for a follow-up (R. 304-05).

Dr. Snuffer prescribed Vicodin and Flexeril to Plaintiff for lower back and left leg pain on October 10, 2005. Plaintiff's lower spine had paraspinal tenderness with no spasms (R. 206-07).

On October 17, 2005, Dr. Snuffer prescribed Darvocet for Plaintiff's left leg pain, and on November 29, 2005, he prescribed Percocet for Plaintiff's right leg pain (R. 208, 210).

On December 9, 2005, Plaintiff was treated for pain in his lower extremity joints, knee, and ankle by Dr. Snuffer, who prescribed Lyrica. Plaintiff stated he had worked on his roof the previous week and was "very sore." Dr. Snuffer instructed Plaintiff to exercise (R. 212).

Plaintiff presented to Dr. Snuffer on December 23, 2005, with joint pain and right leg pain. He stated Lyrica did not treat the pain and he "still ha[d] to take" Percocet. Dr. Snuffer diagnosed limb pain and prescribed Avinza (R. 214).

Plaintiff's leg was "tender to touch" when examined by Dr. Snuffer on December 30, 2005. He prescribed morphine (R. 216).

On January 11, 2006, Dr. Snuffer diagnosed "limb" pain and prescribed Percocet (R. 218).

An x-ray made of Plaintiff's ankle on January 21, 2006, showed "arthritic changes at the tibiotalar joint" and "possible avascular necrosis of the talar dome" (R. 205).

On March 10, 2006, Plaintiff was diagnosed with "pain to ankle" by Dr. Snuffer and he prescribed Voltaren and Percocet (R. 221).

On March 10, 2006, Plaintiff presented to Charles A. Lefebure, M.D., for pain in his right ankle. Dr. Lefebure found Plaintiff "certainly [had] an arthritic ankle," but he did not think he had avascular necrosis. He recommended "conservative care," which included "nonvigorous use," minimizing pain medication, avoiding hard impact and wearing well-fitting shoes (R. 275).

On March 20, and April 12, 2006, Dr. Snuffer found Plaintiff's "lower extremity joint[] pain [was] under better control." He prescribed Voltaren, Percocet, and Demerol (R. 223, 225).

On June 14, 2006, Dr. Lefebure prescribed Naprosyn for Plaintiff's ankle pain (R. 276).

Plaintiff underwent a polysomnography, with no CPAP machine, on November 20, 2006, almost two months after date last insured. Dr. Zuriqat diagnosed obstructive sleep apnea.

Plaintiff's total sleep time was 5.6 hours; his sleep efficiency was 82%; he had one apnea and thirty-seven hypopneas; he had 6.8 respiratory disturbances per hour of sleep; his oxygen saturation decreased to 87%. Dr. Zuriat ordered a "CPAP titration study as soon as possible" and he "strongly advised" Plaintiff to lose weight (R. 236-37).

On December 28, 2006, three months after date last insured, Plaintiff underwent a polysomnography, with CPAP. Plaintiff's total sleep time was 6.9 hours; his sleep efficiency was 83%; he had no apneas; he had no hypopneas; he had no respiratory disturbances. Dr. Zuriqat diagnosed obstructive sleep apnea and found it "should be treated with CPAP." He advised Plaintiff to lose weight (R. 242-43, 288-93)

On March 12, 2008, Dr. Lateef completed a Physical Residual Functional Capacity Assessment of Plaintiff. He noted September 30, 2006, was Plaintiff's date last insured (R. 318). He found Plaintiff's RFC was for light work (R. 325). He noted the following activities of daily living: Plaintiff watched television, helped his wife prepare dinner and with housework; cared for pets; did yard work, which included trimming bushes; read; worked on a train set; did dishes; vacuumed; drove; fished; walked one-hundred feet (R. 323). Relevant evidence on which Dr. Lateef relied in making his RFC finding was as follows: Plaintiff's May, 2004, follow-up to open reduction internal fixation of the fibula and external fixation of the distal tibia showing he had good motor control, good pedal pulses, some numbness, ankle tenderness, a healed wound, and no loosening of hardware; pain clinic records showing Plaintiff complained of left leg pain, had an antalgic gait and left-leg limp; and x-ray showing arthritic ankle (R. 325).

Administrative Hearing

At the administrative hearing, Plaintiff stated he could no longer work due to leg and

shoulder pain, which was made worse by the work he performed (R. 40). Plaintiff stated he could walk without use of an assistive device one-hundred to one-hundred-fifty feet before having to stop. He testified he could stand for five-to-ten minutes. Plaintiff stated he could not bend "real well" at the waist and could squat with difficulty. Plaintiff testified he could make a fist with both hands (R. 41). Plaintiff stated he could occasionally lift twenty or twenty-five pounds. Plaintiff testified he had to change positions in a seated position every ten-or-fifteen minutes (R. 42).

Plaintiff testified he could drive a car, but not for long distances, and that he drove to the hearing, which was a one-hour drive. Plaintiff testified that driving long distances caused his neck and leg to hurt (R. 27-28). Plaintiff testified he could care for his personal hygiene (R. 44). Plaintiff testified he ate meals in restaurants "a lot" (R. 44). Plaintiff stated he rose between 9:00 a.m. and 10:00 a.m., sat on the couch "most of the day," and did yard work, which took "three to four hours" (R. 44-45). Plaintiff stated he last fished in 2007 (R. 47). Plaintiff stated he smoked up to three packages of cigarettes per day for thirty years, but was being treated with Chantix at the time of the hearing for smoking cessation (R. 43).

Plaintiff testified he experienced pain in his right leg. He stated the pain increased throughout the day, which caused him to use a cane or crutches. Plaintiff testified he experienced weather-related pain in his leg (R. 33-35). Plaintiff used a CPAP machine nightly (R 35-36). Plaintiff testified he had been diagnosed with two herniated discs in his neck. The ALJ noted that the MRI of Plaintiff's neck was taken after date last insured; that Dr. Snuffer had noted, in 2005, that Plaintiff had complained of "back" pain; and Plaintiff was still working at the time of these complaints (R. 36). Plaintiff stated he had narcolepsy (R. 37). Plaintiff testified he began treatment in 2008 for anxiety and depression with Dr. Swisher (R.37-38, 43). Plaintiff testified he had been

diagnosed with COPD, for which had been treated by Dr. Rajjoub in 2008 (R. 43).

Plaintiff testified the CPAP machine did not currently improve his sleep because he experienced pain in his leg and it jerked and he had nightmares about the 1996 motorcycle accident. He slept seven-to-eight hours a night (R. 44). Plaintiff stated he was "tired all the time" due to sleep apnea and narcolepsy, which was a problem at work. Plaintiff testified he had fallen asleep in his home and his "helper" had awakened him up. Plaintiff stated he napped "pretty much every day" during "the time in question" (R. 48). Plaintiff stated he currently had to prop his leg to ease the pain (R. 49). Plaintiff stated he experienced side effects from medications in that he was "so doped up [he] didn't even know what world [he] was in half the time" and that his wife had told him he had had a "seizure one time," but he did not "remember anything about it" (R. 48).

Plaintiff testified he medicated with Percocet, Demerol, OxyContin, Neurontin, and morphine (R. 39).

The ALJ asked the VE the following hypothetical:

> Consider the sedentary exertional level of work activity . . . . Now sedentary is lifting only ten pounds occasionally, five pounds or less on a frequent basis. Sitting predominantly emphasizes a limited amount of standing and walking to no more than two hours in an eight hour day, but sitting can be accomplished six hours in an eight hour day. Consider the other postural and environmental limitations that I previously asked you to consider in the prior hypothetical ("no climbing of any ladders, ropes or scaffolds, only occasionally use ramps and stairs, balance, stoop, kneel, crouch and crawl. On environmental restrictions and limitations the hypothetical individual should avoid concentrated exposure to cold temperatures, full body vibration, and hazards. Now the hazards contemplated are moving plant machinery or any unprotected heights" (R. 50)). At the sedentary exertional level of work activity for the relevant period in question would there be jobs that you could identify for a hypothetical person limited to sedentary work? (R. 51).

The VE responded that the jobs of general sorter (50,000 nationally and 550 regionally) and machine tender (141,000 nationally, 1,400 regionally) would be available to such an individual (R. 52).

<u>Evidence to the Court</u>

Plaintiff, in his brief, asserts his counsel of record "discovered new and material evidence" (Plaintiff's brief at p. 12), which is a letter from Karl C. Boone, D.C., dated March 3, 2000, and addressed to "Roy Law" (Docket Entry 12-1, pp. 1-3). It is attached to Plaintiff's Memorandum in Support of Motion for Summary Judgment. In that letter, Dr. Boone wrote Plaintiff presented for "evaluation of his neck and upper back conditions." Plaintiff complained of neck pain, stiffness, soreness, and "some pain radiating more so to the left hand side and down to his upper and middle back." Plaintiff stated he had arm numbness in both arms which radiated to his hands. Plaintiff complained of occipital headaches. Plaintiff stated he awoke "three to four times per night," and it took him "fifteen minutes to go back to sleep" (Docket Entry 12-1, p. 1 of 3).

Plaintiff informed Dr. Boone that he worked three or four days per week (on average). Plaintiff stated he had "increased pain" when he worked overhead or did "any significant lifting." Plaintiff stated his "neck and upper back [were] worse in the early mornings and late evenings." Plaintiff experienced "improvement with stretching and walking but [felt] worse when he [had] to sit for long periods of time especially driving" (Docket Entry 12-1, p. 1 of 3).

Upon examination, Plaintiff's "cervical flexion was . . . 35-40 degrees and increased lower cervical pain." "Cervical extension was . . . 25-30 degrees and also increased lower cervical and upper back pain." Plaintiff could rotate his neck to the right "to approximately 65 degrees and to the left to approximately 60 degrees." Upper extremity deep tendon reflexes were equal, plus two. No pathological reflexes were found in his upper extremities; no gross sensory changes were found. Upper extremity muscle strength was "essentially normal." Plaintiff "demonstrated sharp palpable tenderness suboccipitally as well as over the C5, 6, 7 and T1 spinous processes." Plaintiff had

tightness and tenderness over his left lateral cervical spine (Docket Entry 12-1, p. 2 of 3).

Dr. Boone "retook a three view cervical series" x-ray of Plaintiff and noted the results were similar to those taken on June 25, 1996. He found Plaintiff had "minimal discogenic changes at the C5-6 level and some mild reversal of the cervical lordosis." The x-ray did "seem to show a little more uncovertebral spurring and sclerosis on the left at C5-6 compared to his old films." Dr. Boone "label[ed] (Plaintiff's) condition a very chronic cervical dorsal strain sprain . . . type injury with associated myofacial syndromes and suboccipital headache" (Docket Entry 12-1, p. 2 of 3). Dr. Boone opined Plaintiff's "overall condition should be considered permanent" and "would have a tendency to deteriorate" . . . "in time" (Docket Entry 12-1, pp. 2 of 3, 3 of 3). Dr. Boone discussed, with Plaintiff, "stretching and walking and various home routines in an attempt to keep his pain as minimized as possible" (Docket Entry 12-1, p. 3 of 3).

### III. ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 404.1520 (2000), ALJ Mills made the following findings:

1. The claimant last met the insured status requirements of the Social Security Act on September 30, 2006 (R. 11).

2. The claimant has not engaged in substantial gainful activity at any time relevant to this decision (20 CFR 404.1520(b)) (R. 11).

3. Through the date last insured, the claimant had the following severe impairments: posttraumatic degenerative joint disease of the right ankle, status post right fibula and tibial pilon fracture and open reduction and internal fixation of fractures in November 2003; and obstructive sleep apnea (20 CFR 404.1520(c)) (R. 11).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526) (R. 12).

5.      After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform a range of sedentary work; could perform all postural movements occasionally, except could not climb ladders, ropes, or scaffolds; and needed to avoid concentrated exposure to extreme cold, full body vibration, and hazards, such as dangerous moving machinery and unprotected heights (R. 12).

6.      Through the date last insured, the claimant was unable to perform past relevant work (20 CFR 404.1565) (R. 15).

7.      The claimant was born on July 21, 1964 and was 42 years old on the date last insured, which is defined as a younger individual age 18-44 (20 CFR 404.1563) (R. 15).

8.      The claimant has a limited education and is able to communicate in English (2 CFR 404.1564) (R. 15).

9.      Transferability of job skills is not material to the determination of disability due to the claimant's age (20 CFR 404.1568) (R. 15).

10.     Through the dated (sic) last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1560(c) and 404.1566) (R. 15).

11.     The claimant was not under a "disability," as defined in the Social Security Act, at any time through September 30, 2006, the date last insured (20 CFR 404.1520(g)) (R. 16).

## IV.  DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  The Fourth Circuit held, "Our scope of review is specific and narrow.  We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court

disagrees, so long as it is supported by substantial evidence." *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" *Hays*, 907 F.2d at 1456 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties

Plaintiff contends:

1.  The Administrative Law Judge's residual functional capacity assessment is not supported by substantial evidence because the judge failed to include any limitations from obstructive sleep apnea or narcolepsy.

2.  Even if the Administrative Law Judge's decision is not due to be reversed due to his failure to consider Mr. Barrett's narcolepsy, the Court should remand this matter to the Commissioner to consider new and material evidence concerning [Plaintiff's] herniated disc in his back.

The Commissioner contends:

1.  The ALJ accounted for Plaintiff's sleep apnea by limiting Plaintiff to sedentary work involving no hazards, and Plaintiff's complaint of irresistible bouts of sleep was undermined by the medical evidence, his failure to mention this limitation in his DIB application and his ability to drive.

2. A letter dated over nine years before the ALJ's decision does not warrant a Sentence Six remand.

## C. Sleep Apnea and Narcolepsy

Plaintiff contends the ALJ's RFC assessment is not supported by substantial evidence because the judge failed to include any limitations from obstructive sleep apnea or narcolepsy. Defendant contends the ALJ's RFC provided for limitations caused by Plaintiff's sleep apnea.

The ALJ found Plaintiff's sleep apnea was a severe impairment. He made no such finding as to narcolepsy. In his decision, the ALJ opined that "although the claimant's sleep studies revealed some evidence of narcolepsy, the longitudinal record supports a finding that the claimant has obstructive sleep apnea" (Exhibit 7F) (R. 11).

At step two of the sequential evaluation, Plaintiff bears the burden of production and proof that narcolepsy was a severe impairment. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983). To be "severe," an impairment must significantly limit the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c), 416.920(c). The record does not contain evidence that Plaintiff's ability to do work activities was limited by narcolepsy.

Plaintiff was diagnosed with obstructive sleep apnea and upper airway resistance syndrome on September 18, 2001 (R. 312-13). Plaintiff was diagnosed with excessive daytime sleepiness, snoring and upper airway resistance syndrome on August 19, 2003 (R. 307-10). Plaintiff underwent Multiple Sleep Latency Testing on October 15, 2004, and was diagnosed with narcolepsy; on that same date, he underwent a sleep study and was diagnosed with excessive daytime sleepiness (R. 304-05). The next sleep study in the record is dated November 20, 2006, more than two years after the sleep latency test upon which Plaintiff's diagnosis of narcolepsy was based, and almost two months after date last insured. Dr. Zuriqat's diagnosis, based on that report, was for obstructive

sleep apnea (R. 236-37, 294-97). On December 28, 2006, another polysomnography study was conducted, with CPAP; Dr. Zuriqat diagnosed obstructive sleep apnea (R. 242-43, 288-93). Subsequent to these 2006 studies, a January 13, 2008, study provided a diagnosis of obstructive sleep apnea syndrome (R. 280-81).

The medical records do not provide any basis for the ALJ to conclude narcolepsy was a severe impairment. The October, 2004, Multiple Sleep Latency Test showed Plaintiff's "mean sleep latency . . . [was] 6.7 minutes with 2 sleep onset REM periods" (R. 304). Based on this information, Dr. Zuriqat diagnosed narcolepsy. He prescribed Provigil, noted Plaintiff would "be observed for any symptoms of cataplexy," and instructed Plaintiff to return in one month for a follow-up (R. 304-05). There is no record of evidence that Plaintiff had any negative side effects from his medicating with Provigil or that this medication was not effective in treating his condition. Dr. Zuriqat noted that Plaintiff should be observed for cataplexy, but there are no records that he was under observation for this narcolepsy-related condition or that he was ever diagnosed with it (R. 236-37, 242-43, 280-81, 288-93, 294-97, 298-305).

Plaintiff, as noted by Defendant, testified at the administrative hearing that he was "tired all the time" at work due to sleep apnea and narcolepsy. Plaintiff testified he had fallen asleep in his home and his "helper" woke him up. Plaintiff stated he napped "pretty much every day" during "the time in question" (R. 48). Plaintiff did not assert he could no longer work due to symptoms of narcolepsy; he testified he could no longer work due to leg and shoulder pain (R. 40). Additionally, in his DIB application, Plaintiff did not claim that his work was limited because of narcolepsy or the symptoms thereof (R. 121).

Narcolepsy did not restrict Plaintiff's activities (R. 280-81, 288-93, 294-97, 298-305, 307-

14

10, 312-13). Plaintiff was never instructed not to drive due to this condition (R. 280-81, 288-93, 294-97, 298-305). Plaintiff testified his driving was limited to up to one hour due to pain, not symptoms of narcolepsy (R. 27-28). Plaintiff worked on his roof in late 2005, more than one year after his diagnosis of narcolepsy (R. 212).

Because the evidence that the ALJ considered and weighed showed that Plaintiff's narcolepsy did not significantly limit his ability to do basic work activities, the ALJ's RFC and his finding as to Plaintiff's narcolepsy are supported by substantial evidence.

As to sleep apnea, Plaintiff argues the ALJ "did not ensure that the vocational expert considered [Plaintiff's] limitations from sleep disorders" because the ALJ "never advised [the VE] that [Plaintiff] would on occasion fall asleep at work" (Plaintiff's brief at p. 11). The Defendant asserts that the "ALJ specifically accounted for sleep apnea by limiting Plaintiff to sedentary work that involves no exposure to hazards" and that the "only limitation Plaintiff believes would preclude him from performing such work is that he 'would on occasion fall asleep at work' due to narcolepsy (Pl.'s Br. at 11). This limitation is unsupported by the record" (Defendant's brief at p. 8). The undersigned finds the ALJ's hypothetical question to the VE included the limitations that accommodate Plaintiff's symptoms from sleep apnea.

As noted above, the record of evidence contains sleep study results that contain diagnoses of obstructive sleep apnea and upper airway resistance syndrome on September 18, 2001, for which Plaintiff was instructed to use a CPAP machine for treatment; excessive daytime sleepiness, snoring and upper airway resistance syndrome on August 19, 2003, for which he was advised about diet and weight management as treatment; narcolepsy and excessive daytime sleepiness on October 15, 2004, for which he was prescribed Provigil (R. 304-05, 307-10, 312-13). Subsequent to his date last

insured, Plaintiff was diagnosed with obstructive sleep apnea on November 20, 2006, for which he was instructed to lose weight as treatment; obstructive sleep apnea on December 28, 2006, for which he was instructed to use CPAP machine; and obstructive sleep apnea on January 13, 2008 (R. 236-37, 242-43, 280-81, 288-93, 294-97). Plaintiff was treated by Dr. Zuriqat, Dr. Husari, and Dr. Rajjoub and none of these physicians limited or restricted Plaintiff's ability to do work due to sleep apnea (R. 236-37, 242-43, 280-81, 288-93, 294-97, 298-305). The record of evidence does not contain any complaints by Plaintiff that he would occasionally fall asleep at work or that the CPAP machine was not effective in treating his sleep apnea (R. 236-37, 242-43, 280-81, 288-93, 294-97, 298-305).

As noted by Defendant, Plaintiff's assertion that he would fall asleep at work is unsupported by the record (Defendant's brief at p. 8). At the administrative hearing, Plaintiff's non-attorney representative stated, then asked the following: "You were diagnosed with the sleep apnea and narcolepsy prior to when you finally stopped working all together. Did it cause you any problems at work?" Plaintiff replied, "Yes, I was tired all the time, and there was a few time like I was – if I was in the house or something I fell asleep and my helper had woke me up" (R. 48). Plaintiff did not testify, as asserted in his brief, that he occasionally fell asleep at work; he stated he was experienced tiredness at work. Additionally, when questioned at the administrative hearing about the CPAP machine, Plaintiff testified that he did not sleep "good" with the CPAP machine, but his reasons for not sleeping well were he experienced pain in his leg, his leg jerked, and he had nightmares about the accident. Plaintiff testified he slept seven-to-eight hours a night (R. 44).

The ALJ reviewed the "longitudinal"(R. 11) record of evidence and Plaintiff's testimony and made the following finding:

The medical records also establish that as of his date last insured the claimant had a history of treatment for obstructive sleep apnea. The claimant was diagnosed as having obstructive sleep apnea following a sleep study on September 18, 2001. He was prescribed a CPAP machine. Following a subsequent sleep study on October 15, 2004, the claimant was diagnosed as having narcolepsy and excessive daytime sleepiness (Exhibit 7F). However, following a sleep study on November 21, 2006, the claimant was once again diagnosed as having obstructive sleep apnea and prescribed a CPAP machine (Exhibit 3F). The claimant's sleep apnea present during the period in question is found to have been adequately controlled with the use of a CPAP machine. He has failed to establish a basis for complaints of fatigue or sleepiness that would preclude his performance of the range of sedentary work that precludes his performance of jobs involving concentrated exposure to hazards (R. 24).

As noted in his decision, the ALJ considered all the relevant treatment records for Plaintiff's sleep apnea. More specifically, Exhibit 3F contains the following evidence. The sleep study conducted on November 20, 2006, was without use of a CPAP. It was noted that Plaintiff had one apnea and thirty-seven hypopneas, which resulted in a "respiratory disturbance index . . . of 6.8 events per hour of sleep" (R. 236, 295). During Plaintiff's December 28, 2006, sleep study, a CPAP was used. The results showed zero apneas, zero hypopneas and no respiratory disturbances. It was noted that Plaintiff "did very well on nasal CPAP" (R. 242, 289). The ALJ's decision that Plaintiff's sleep apnea is adequately controlled with the use of a nasal CPAP is supported by substantial evidence.

Furthermore, the ALJ's hypothetical question to the VE contained limitations for Plaintiff's sleep apnea that were supported by the record of evidence as noted above. The hypothetical was for the sedentary exertional level, which included the environmental restriction of no exposure to hazards (R. 51).

When "questioning a vocational expert in a social security disability insurance hearing, the ALJ must propound hypothetical questions to the expert that are based upon a consideration of all

relevant evidence of record on the claimant's impairment." *English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir.1993) (citing *Walker v. Bowen*, 876 F.2d 1097, 1100 (4th Cir.1989)). If the ALJ poses a hypothetical question that accurately reflects all of the claimant's limitations, the VE's response thereto is binding on the Commissioner. *Edwards v. Bowen*, 672 F. Supp. 230, 235 (E.D.N.C. 1987). The ALJ found and the record supports his decision that Plaintiff's sleep apnea was sufficiently controlled with the prescribed treatment; the ALJ's hypothetical question to the VE is sufficient; and the ALJ's decision is supported by substantial evidence.

### D.  Sixth Sentence Remand

Plaintiff next argues that this matter should be remanded for the Commissioner to consider new and material evidence pursuant to the sixth sentence of 42 U.S.C. § 405(g).  Defendant contends that the additional evidence submitted by Plaintiff to the Court does not warrant a remand.

In *Borders v. Heckler*, 777, F.2d 954, the Fourth Circuit held:

> A reviewing court may remand a Social Security case to the Secretary on the basis of newly discovered evidence if four prerequisites are met. The evidence must be "relevant to the determination of disability at the time the application was first filed and not merely cumulative." *Mitchell v. Schweiker,* 699 F.2d 185, 188 (4th Cir.1983). It must be material to the extent that the Secretary's decision "might reasonably have been different" had the new evidence been before her. *King v. Califano,* 599 F.2d 597, 599 (4th Cir.1979); *Sims v. Harris,* 631 F.2d 26, 28 (4th Cir.1980). There must be good cause for the claimant's failure to submit the evidence when the claim was before the Secretary, 42 U.S.C. § 405(g), and the claimant must present to the remanding court "at least a general showing of the nature" of the new evidence. *King,* 599 F.2d at 599.

The evidence submitted by Plaintiff, and attached to his Memorandum in Support of Motion for Summary Judgment, is a letter from Karl C.  Boone, D.C., dated March 3, 2000, and addressed to "Roy Law" (Docket Entry 12-1).  That letter contains information about Plaintiff's neck and upper back conditions and arm numbness.  In his letter, Dr.  Boone opines that Plaintiff's condition

would not improve and may deteriorate and that Plaintiff should stretch, walk, and undertake home routines to minimize his pain (Docket Entry 12-1 through 3).

As noted above, there are four factors the Plaintiff must meet in order for evidence qualify as new and material. First, the evidence must not be cumulative, but new evidence. Dr. Boone's letter is not "new." Dr. Boone's letter was written on March, 3, 2000. It existed at the time of the ALJ's decision in this case.

Next, the evidence must be material. The opinions found in Dr. Boone's March, 2000, letter are not material. Plaintiff asserts the evidence and opinion in Dr. Boone's letter are material because the Defendant's decision "might reasonably have been different had the Judge included [Plaintiff's] limitations resulting from a neck impairment and radiculopathy in the upper extremities" (Plaintiff's brief at p. 13). The undersigned disagrees. Dr. Boone is a chiropractor. A chiropractor is not an acceptable medical source.

20 C.F.R. § 416.913 establishes what sources can provide evidence to establish a medically determinable impairment. It reads:

"(a) . . . We need evidence from acceptable medical sources to establish whether you have a medically determinable impairment(s). . . . Acceptable medical sources are:
(1) Licensed physicians (medical or osteopathic doctors);
(2) Licensed or certified psychologists. . . .
(3) Licensed optometrists . . . .
(4) Licensed podiatrists . . . .
(5) Qualified speech-language pathologists . . . ."

(d) Other sources. In addition to evidence from the acceptable medical sources listed in paragraph (a) of this section, we *may also use evidence from other sources to show the severity of your impairment(s)* and how it affects your ability to work or, if you are a child, how you typically function compared to children your age who do not have impairments. Other sources include, but are not limited to –

(1) Medical sources not listed in paragraph (a) of this section (for example, chiropractors . . . (emphasis added).

Nothing in the regulation requires an ALJ to consider the opinion of a chiropractor. Even if Dr. Boone's letter had been part of the record before the ALJ at the time of his decision, it would not have been material because the ALJ was not mandated to consider the findings and opinions contained therein in making his decision. The ALJ had discretion to "use evidence" provided by Dr. Boone to show the severity of his neck impairments and upper extremity limitations, but the ALJ did not make a finding, based on the evidence of record, that Plaintiff had neck impairments or upper extremity limitations. Additionally, the Fourth Circuit, in *Lee v. Sullivan*, 945 F.2d 687, 691 (1991), has held that those other than "an 'acceptable medical source'" do "not qualify . . . to make a 'medical assessment' on a Social Security claimant's 'ability to do work-related activities such as sitting, standing, moving about, lifting, carrying, handling objects, hearing, speaking and traveling'" and their "assessment can qualify only as a layman's opinion."

Plaintiff did not meet the third factor in that he did not establish "good cause" as to why the letter from Dr. Boone was not submitted before prior to the administrative hearing. Plaintiff assertion that the "evidence was not discovered until the [Plaintiff] obtained new counsel" is not good cause. Plaintiff relies on a Southern District of West Virginia case, *Brock v. Secretary*, 807 F.Supp. 1248, 1251 (1992), to support his assertion that the evidence should be considered because he retained new counsel. In *Brock*, the district court found claimant therein was transient, possibly impoverished, and did not receive continuous medical treatment for those reasons. *Id.* at 1250. The *Brock* court noted that there was a "paucity of medical evidence" in the case and that after the ALJ's decision, claimant retained new counsel, obtained a medical card as an indigent person, and was

evaluated by the doctor whose medical record was submitted as new and material evidence to the district court. *Id*. at 1250. The circumstances in the instant case differ substantially from those in *Brock*. Plaintiff's medical care was continuous and not limited due to his financial circumstances or his lack of insurance. Dr. Boone's 2000 letter already existed and was not obtained as a result of a change in Plaintiff's financial or insured status. Additionally, Plaintiff was represented by a non-attorney representative at the administrative hearing and before the Appeals Council, who had the opportunity to produce the letter from Dr. Boone.

Plaintiff met the fourth factor in that he did provide "to the remanding court 'at least a general showing of the nature' of the new evidence" in that he attached a copy of Dr. Boone's 2000, letter to his brief.

For the reasons stated above, the undersigned finds the evidence submitted to the Court by Plaintiff is not new, was not material, and good cause for it not being produced earlier does not exist. The undersigned, therefore, recommends Plaintiff's motion to remand under sentence six be denied.

## V. RECOMMENDED DECISION

For the reasons above stated, I find that the Commissioner's decision denying the Plaintiff's applications for DIB is supported by substantial evidence. I, accordingly, recommend the Defendant's Motion for Summary Judgment be **GRANTED** and the Plaintiff's Motion for Summary Judgment and Motion for Remand Pursuant to the Sixth Sentence of 42 U.S.C. § 405(g) be **DENIED** and this matter be dismissed and stricken from the Court's docket.

Any party may, within fourteen (14) days after being served with a copy of this Report and

Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Frederick P. Stamp, Jr., United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 27th day of January, 2011.

s/ *John S. Kaull*

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE